Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Carl A. Walker presiding, case number 22-0309, Laurel Wong v. Midwest Gaming & Entertainment, LLC. Good afternoon, everyone. I'm Justice Walker, and I have here with me today Justice Johnson and Justice Taylor. And what I'd like to do is start by asking the lawyers to introduce yourselves. Good afternoon, Justices. Evan Smola on behalf of the Plaintiff Appellant, Laurel Wong. Good afternoon, Your Honors. Casey Leach on behalf of Appley Midwest Gaming & Entertainment, LLC. Thank you. And Mr. Smola, do you want to reserve some time for a rebuttal? I would like to reserve five minutes, Your Honor. Five minutes. Okay. So we're going to give you each a total of 20 minutes, and you'll have the five minutes for rebuttal. And so with that, Mr. Smola. Thank you, Your Honor. May it please the Court, Counsel Evan Smola on behalf of Laurel Wong. We're here today because Ms. Wong was sexually harassed by a third party at her place of work, Rivers Casino. In a situation in which a third party is committing the harassment, an employer is responsible and liable for that harassment if they, A, become aware of the conduct, and B, fail to take reasonable corrective measures over the conduct. In this case, the very first incident involving Ms. Wong was on July 6th. There is no dispute on the part of the plaintiff that July 6th alone would have given rise to any sort of claim here. But in the days that followed, Ms. Wong repeatedly requested that her employer put something in place to prevent what had happened to her from happening again. She asked on July 7th when she arrived at work, nothing was in place. She asked that week, and then on July 13th, there are two incidents, very similar to the first one, in which two men approach her, come behind her beer tub where she hugged her in a non-consensual, unwelcomed manner. This occurred a second time that evening with these same two men, and the final incident occurred the following evening on July 14th when a man kissed her on the cheek without her consent. The question raised in this appeal is whether, as a matter of law, the steps taken by Rivers constituted reasonable corrective measures in this case. In looking at the case law, there's frankly very little case law on what exactly a reasonable corrective measure is. Our trial court admitted that the reasonableness of conduct is generally a question of fact for the jury. So, Mr. Small, why don't you go ahead and kind of cut to the chase and walk us through this. What do you believe would have been reasonable measures? Sure, the exact thing that they ultimately did put in place, albeit late. So, what Ms. Wong was dealing with was, she is behind a beer tub in a casino surrounded by there's a space where she can enter and exit the area, but her back is to a bar, so she can't exit to her left or her right if someone approaches her from the side of the beer tub. She proposed corrective measures to her employer. She said, we can put a stanchion here, you could put a garbage can there that I can move when I need to leave. Can you please have one of those in place? Well, they did place the garbage can there, though. That was one of the suggestions that she made, and that's what they did. They did that on one day, and then on the following weekend, I'm sorry, on the very next day when she arrived at work, there was nothing present. She asked, can there be something present here? They said they thought it looked tacky to have something there. And then the following weekend, she has two additional incidents where there's nothing in place when she arrives at work. Two men do the same thing that happened to her, or very similar. I thought on one of those times that they came around the barrier. Well, someone of you guys came around the barrier, isn't it correct? No, I don't think that's correct, Your Honor. There's no evidence that there was a barrier in place on July 13th when those two incidents were on the same day, correct? I'm sorry, I missed the last part. Those two incidents were on the same day. Correct. And then on the following day, again, she arrived at work with nothing in place, and another incident occurred. And so the question is, does this conduct and the lack of a barrier during these occasions, did Rivers take those corrective measures? I like to think of sort of analogies when there's not a lot of case law in defining reasonable corrective measures. But if we think of like a conventional premises liability case, if a landowner had notice of a hazard on their property that was causing injury, and they say, let's say it's a parking lot, and they say, you know, we've got a permanent solution coming, we're going to repave the parking lot in two weeks. Someone's hurt, they're given notice, this is a problem, and they do nothing. They just wait for the repaving to occur. We would say, sure, maybe a jury will conclude that that conduct is reasonable, but maybe a jury would conclude that they should have put a barrier in place around the the premises defect. So I'd be hesitant to expect a court as a matter of law to say that remedy when an easily available remedy has been proposed to you by the victim, and it's just not been put in place because it looks tacky. But just so we're clear, Mr. Smoller, that the remedy that was requested was the garbage cans or the stanchions, correct? That's correct. That's what was requested, and so they did try the garbage cans. That didn't work, obviously, because it is my understanding that at some point someone did go around the garbage can, then they did eventually put the stanchions up, correct? No, the garbage can worked. So the garbage can's put in place on that very first day, July 6th. So there's an incident, someone sees what's transpiring, the garbage can is put in place, there's no further incidents that day. So then what happens ultimately is our client, Ms. Wong, texts her supervisor saying, is there going to be something in place? Frankly, she didn't care whether it was a garbage can or a stanchion or something else. They say, we'll figure something out, and then when she arrives, the solution is not in place, and the incidents happen again. So there were clear, she herself had suggested the reasonable corrective measures. What our trial court held was that eight days to implement the measures was acceptable. A jury could conclude that given the repeated notice to the defendant, given the very easy and economical and feasible solution, that should have been put in place right away. This is a highly resourced defendant who is told repeatedly that they have a problem, they are given a number of solutions to correct that problem, and they delay implementing those solutions. So if the trial court concluded that delay didn't matter, and that as a matter of law, eight days to put in place the suggestion of Ms. Wong was reasonable, a jury could conclude that that was not a reasonable delay, that it should have been put in place right away. Let me ask you this question, counsel. I'm sorry, Justice. That's all right. Go ahead. Okay. So the trial court issued a summary judgment on the retaliation issue as well. Why did you not or choose not to address that in your appeal? We chose not to address that on the appeal because of the other options that our client was given in facility. There was some overlapping issues where she had a wrist injury. I don't know if that came up extensively in the record, but the retaliation claim, we did feel like ultimately there were accommodations made for that injury and that the retaliation claim wasn't justified. Yeah, that's why she's serving in that current position because of her injury. They were the facts are not disputed. The courts of this state have found that the trial judge can make that decision as a matter of law. Correct? You're aware of that? Well, I'm aware that where facts are not disputed and no one can draw other inferences, other reasonable inferences, a court can enter summary judgment on the undisputed facts. The question here, though, is can a reasonable person draw a different inference from these facts? Namely, that someone should have implemented this solution immediately. This was not a situation in which the solution of the problem is some very difficult, expensive, unfeasible thing. It wasn't changing the architecture of the casino or anything that justified any sort of putting up something that you see at the Daily Center every day, the stanchions that kind of guide people towards a particular direction or at a movie theater where it prevents people from going behind certain spots. That solved the problem. The fundamental issue, though, was the problem solved quickly enough and why should Ms. Wong have been subjected to these further incidents when there was such an easy solution? Right. And I do recall that they did ask Ms. Wong several times that, you know, you have to bring this to our attention. You have to let security know or let management know right away. And at one point she did and that person was removed from the casino. Yeah, she, I mean, she's repeatedly informed her supervisors both via text and in person of some of the problems and ultimately proposed solutions to the problem. Her proposed solutions, though, fell on deaf ears. And frankly, their response was that looks tacky in our casino and you need to take control of your personal space. Well, she's not in a position like similar servers at the casino where they can just walk away and go get somebody. She's literally pinned in a corner of the casino selling beer to patrons. And so in that position, an easy way to prevent people from going behind the tub and approaching her and engaging in non-consensual physical touch would be to put up a stanchion. They did it quite easily once she reminded them for the third or the fourth time that nothing is in place. And so does, is it appropriate for a court to say that as a matter of law, three additional incidents don't matter and eight days can pass without the solution. And those three additional incidents, there's no liability for. I do not believe that is the case. A jury should be able to decide whether the conduct of the casino constituted a reasonable corrective measure. If a jury decides that someday fine. But as a matter of law for three incidents with repeated notice and a clear solution to have gone ignored, I don't think as a matter of law that constitutes reasonable corrective measures. Are there any cases where I was found that failure to address the issue and, you know, less than 10 days or any particular period of time was not reasonable? No, I candidly found very little case law outlining or analyzing reasonable corrective measures. It's not defined in the statute. You know, sort of some things that have been cited as reasonable corrective measures are providing some level of support to the victim, increased monitoring of the workplace at issue. Here, she was not supported. She was dismissed. She, you know, the casino monitors all of its blackjack tables quite easily. Her station was not monitored any more closely, at least not to the point where three people could get behind her beer tub. I imagine that if somebody tried to get behind a poker table and start talking to a So, you know, I do believe that there were easy, reasonable corrective measures to be made, but that the delay here was not reasonable and can't be decided as a matter of law. So, just to summarize your position in a nutshell, it's that the defendant's failure to place any obstacle after having been notified that someone had approached its employee behind the beer station, that that was not reasonable. That's correct, your honor. Do you know how wide a distance we're talking about that was the access point to your client? In terms of the area where a person could access behind the beer tub? Yeah, because you mentioned that there was a garbage can placed there, and I'm just wondering if someone can walk around the garbage can because it's wide enough, or whether, is there anything in the record about the distance? There's no measurement of any kind. There is video in the record. I mean, I would say it speculating at least a bit on that front. And lastly, your honors, this was not a specific point of the trial court's ruling, but in terms of the pervasiveness of the harassment, we look to the totality of the circumstances. And I think that that's relevant here, mainly because of the defendant's reaction to Ms. Wong. Their reaction was to ignore her solution, delay implementing her solution, dismiss her as not having control over her personal space, and as needing to take charge of herself when she was taking charge of herself. She was proposing solutions that were dismissed as tacky. And so taking those circumstances and the repeated instances in a very short period of time, we would argue that the accumulation of those events show that this was pervasive and had an easy solution. And with that, unless the court has any further questions, I'll yield to Mr. Leach. I do have a follow-up, Mr. Shimola. So you indicated that the employer's response was to take control of her station. Is there any evidence in the record about how she was supposed to take control of her station? For example, did they tell her that you should just tell the customer, stop, no, leave this area, that sort of thing? Is there anything in the record about that? No, there's not a lot of detail about what they meant by that. It was this language, I believe, if I'm correct, was found in an incident report. And so there's not a lot of extrapolation from what they meant by that or what they hoped by that. I would say that she was trying to take control of her situation by proposing solutions to the defendant. Thank you. Thank you, Your Honor. Thank you, Mr. Shimola. Mr. Leach. Good afternoon, and may it please the court. The circuit court judge properly granted summary judgment for Midwest Gaming and Entertainment, the owner and operator of Rivers Casino. Specifically, the court correctly held that the measures that Rivers implemented after eight days of Ms. Wong's first complaint of harassment was reasonable as a matter of law under the Illinois Human Rights Act. Ms. Wong does not argue the effectiveness of the permanent measures. After Rivers placed the stanchions at the beer tub to prevent customers from getting too close to her, Ms. Wong said the stanchions worked wonderfully, and she never again complained of harassment. Ms. Wong argues that the circuit court could not have decided whether Rivers' actions were reasonable as a matter of law, that instead this is an issue for the jury to decide. But this argument ignores the many harassment cases where summary judgment has been granted by trial courts and affirmed by appellate courts on the basis that employers' corrective measures were reasonable as a matter of law. In these other cases, employers took much longer than a few days to rectify complaints of harassment, sometimes even months later. The Illinois Human Rights Act— Mr. Leach, let's just pause for a second because I think what Mr. Smaller is saying is that this was an easy solution. I realize that Ms. Wong gave options, either a garbage container or the stanchions, and they chose originally to go with the garbage cans. But he's arguing that the solution was so easy and that they just refused to do what they should have been doing. That's argument that Mr. Smaller is making. I understand the argument, Your Honor. The courts have, in cases cited in our brief, courts have hit on a very similar issue. For example, in Saxton v. AT&T, the Seventh Circuit affirmed summary judgment and noted, a quote was, no doubt AT&T could have done more. Likewise, the Seventh Circuit in Lapka v. Churkoff said that it is not availing to say that the employer should have taken even more aggressive measures and that measures taken by employers will often not meet plaintiffs' expectations. The Illinois Human Rights Act and Title VII do not require that the employer take the corrective measure that's recommended by the plaintiff necessarily. It's just that the corrective measures must be reasonable. And counsel made a note that this was an easy fix, putting up stanchions or the trash cans was an easy fix that could have been implemented immediately. That may be so, but in other harassment cases, the corrective measure in other harassment cases is often separating the harasser, especially in cases where it's a co-worker harassing the plaintiff. Those corrective measures are often distancing the harasser from the complainant, maybe moving the harasser to a different shift. Those are personnel decisions that also could be immediately implemented. No different than moving a physical barrier. Again, the Illinois Human Rights Act does not require that if that corrective measures be implemented immediately. Again, it's only if the employer becomes aware of the conduct and fails to take reasonable corrective measures is an employer liable for the acts of non-employees, including customers. Mr. Leach, can I interrupt you? There's no dispute that the employer was aware of the harassment that its employee was suffering, correct? That's correct, after July 6th. Right. So the only question is whether the employer acted reasonably, right? That's right, Your Honor. And the question of reasonableness is often, very often, almost universally drawn by a jury. And in this instance where you have I think at least two days where the employer had not placed anything between its employee and the general public, why couldn't the jury find that the employer's actions were not reasonable? Your Honor, the court's interpreting harassment cases previously and even very recently, as 2022, have come to conclusions that as a matter of law, employers' actions were reasonable and that it does not need to go to a jury to decide. And in those cases, they took much longer, sometimes months, to implement the corrective measures. Here we're talking about... Those are the federal cases that you cite, which you acknowledge were not bound by, correct? I understand, yes. So where do you draw the line? What is the test you would propose that the Illinois courts adopt in terms of timing and reasonableness? In terms of analyzing Title VII, what the courts have said is that the employer acts unreasonably if it either delays unduly or if the action taken, however promptly, is not reasonably likely to prevent the misconduct from recurring and that what reasonable depends on, in part, is the gravity of the harassment. In this case, prior to July 14th, the conduct of which Ms. Wong complains was largely comments, flirtatious comments, and a couple of hugs. Prior to July 16th, Rivers had no reason to know, after Ms. Wong had worked there for years, Rivers had no reason to know that all of a sudden, after her first complaint, that she would have these experiences shift after shift. And based on the conduct of the customers and the fact that no complaints had been brought prior to July 6th, it was reasonable for Rivers not to have immediately implemented these corrective measures. And again, there were no complaints of harassment prior to July 6th. Do concepts of reasonableness evolve with the general mores of the society? I would think that they could, but ultimately... So those cases, the federal cases that you're talking about, the peck on the cheek, the little squeeze here and there, where the courts granted summary judgment to defendant, why couldn't a reasonable juror say today, well, that constitutes sexual harassment? I know that's not the context of our particular issue in terms of timing, but my point is this, that it's really for the jury to make this determination. There is some evidence here that the defendant failed to act reasonably when, as Mr. Smola points out, the fix was simple. It was just to put a barrier, a stanchion, which you see very commonly in all kinds of places of public accommodation, whether it's an airport or a courthouse or a store, those things work. And it could have been done and it wasn't. And as a result, she suffered unwanted sexual harassment. I understand the argument, Your Honor. Again, as I was saying, often corrective measures can be done immediately. They can be immediately implemented. For example, a personnel decision, moving someone to a different ship requires nothing more than a phone call or a change to a schedule. And just as those corrective measures could be immediately implemented, again, yes, Rivers could have, but at the end of the day, the test is not whether Rivers should have listened to Ms. Wong or how easy the corrective measure was to be implemented. When it comes to, as the federal courts have analyzed harassment cases under Title VII, the reasonableness often comes down to the gravity of the harassment. If there was one customer who was continually harassing Ms. Wong and it was over the period of many months, and it certainly, if it was physical, that would be one thing. But here we're talking about different customers coming around the side of the beer tub where it was it was certainly unwanted attention. But the fact that Rivers took a few days to figure out what was the best corrective fix to the situation does not mean that they acted unreasonable. Mr. Leach, doesn't the fact that there were different customers that came around actually run counter to your position? Because if it was only the same person, your time that was doing it, perhaps the response would be different. But you have multiple customers doing it, which suggests that it's a more widespread problem, isn't it? I disagree respectfully, Your Honor. My point being that if it was one person who was engaging in this conduct, the fix would be they could have banned the employee. And that's exactly what happened with the customer who kissed Ms. Wong on the cheek as they asked her who was this employee and identify him. And as soon as she did identify him to security, they immediately ejected him and then banned him for a year afterwards. In here, though, there it's a different you know, the fact that there are different customers. Again, this had never been an issue prior to July 6. And Rivers had no reason to believe that it would be a continuing problem that required an immediate fix beyond the temporary measures of putting the trash cans in place. And as a reminder, the times that the trash cans were put into place as a temporary measure on July 6, and on July 13, it was after a manager witnessed what happened. And you're on July 6, the manager saw the customer come around the side of the beer tub. He told the customer he was not allowed to go there and then put the garbage can in place. And the same thing happened on July 13, that even though the garbage can was not there at the beginning of the shift, when the manager saw the customer walk behind the beer tub, the manager again, placed the garbage can next to the beer tub to stop again, doesn't that doesn't that run counter to your position then because you have the person in authority, the person who presumably is, you know, responsible for the its employees, he sees it and or she sees it and then she takes action. And it's based on conduct that she had previously described. I understand your honor, it is a it's certainly miss miss Wong's position that it was an easy fix. But but it's not it's, again, there was no there was no requirement, the law, the Illinois Human Rights Act does not require that this that these corrective measures be done immediately. And by and large, they were the corrective measures were implemented fairly within days after her first complaint. On for on July 14, is when Miss Wong experienced the worst conduct. And, and, and prior to this, you know, Miss Wong contends that the fix that it was unreasonable for rivers to not have found a permanent solution or concerns by this point. But again, after years, there was no reason to believe that with Miss Wong having worked with the beer tub for several years, that this would become an immediate problem that required this immediate solution. And again, putting putting the barriers in place was not the only corrective measure that rivers took. They banned the customer starting in September on September 2, when Miss Wong first notified them of who the customer was on the sheet, security found him and ultimately banned him from for a year. So based on these facts, and although we understand that the you know, the federal cases interpreting Title Seven is not binding, but it's certainly persuasive. And there's an array, Mr. Leach, you said earlier, you mentioned all the steps that rivers took, and you said that all those steps could be considered reasonable. Is that correct? Is that what you said? The garbage cans you're on? Or is that what you're Yeah, eventually the stanchions and, you know, telling the customers not to come back there. And I think they even said to Miss Wong that, you know, you've got to let them know that they can't come back there. And you believe that all the steps that they took, you said earlier, they could have been reasonable, correct? That's right, Your Honor. These were these were real temporary measures. Right. But my question is, when you say that they could have been reasonable, but that means that a reasonable jury could say that they could not have been reasonable. And I want to just get you to explain that to us, if you see the distinction there. I think if I said that, Your Honor, I misspoke, I think it certainly, I will say that it certainly was reasonable for rivers to have taken the steps that they did in putting the trash cans in place as a temporary measure telling the customers not to go behind there. These are all reasonable actions in the interim, prior to the ultimate decision to put the stanchions in place. You know, opposing counsel has also made reference to the fact that that that rivers management had told Miss Wong to take control of her station and that and that this was, you know, in the briefs, I believe it's it's characterized as a sort of victim blaming. You know, that's not really what happened at all. It was the river's actions. It was really multifaceted prior to putting the stanchions in place as a permanent measure. Not only did they put the trash cans in place when they saw issues, they told the customers not to go behind the beer tub, but also telling Miss Wong, you know, hey, if you see, if you see, if someone comes behind your beer tub, you're to inform management or security immediately and also tell the person they're not allowed to go behind the beer tub. So for all of these reasons, not only was rivers actions reasonable in the interim, but then ultimately they were they were reasonable after July 14th and on a permanent measure such that Miss Wong never again complained of harassment. And these actions were reasonable and the court can find as many other courts, you know, at the federal level and throughout the country have decided issues of reasonable corrective measures as a matter of law and based on the council. But those courts that determined whether or not the actions were reasonable as a matter of law also found that there were no issues of that were taken. Are you suggesting that none of those are in dispute? The facts as to actually what happened are largely not in dispute. I mean, many of these incidents were captured on security footage and that is part of the record. And so they really are. But even taking Miss Wong's allegations as true, that they don't rise to level of showing that that what happened here was unreasonable on Rivers Park. And if I may, although the circuit court did not find some did not grant summary judgment on the base of severe pervasiveness, I'd like to touch on that very, very briefly. The circuit court noted that what Miss Wong experienced from customers is something to which no one should be subjected. Rivers agrees that its employees should not experience inappropriate and unwelcome behavior from its customers. But for conduct to be legally harassing under the Illinois Human Rights Act, it must be severe or pervasive. Again, the conduct of which Miss Wong complains occurred over the period of only four work shifts. During these four work shifts, a few customers came around the side of and two hugged her. Then on July 14, one gave her a hug and kissed her on the cheek and a different one pinched her on the waist. In counsel's argument earlier- You don't think that's pervasive, counsel? It's not as a matter of law, Your Honor. It is not pervasive over a period of a few days. And it's certainly not severe. And courts have held that even more egregious actions over the course of a longer period of time is not severe or pervasive as a matter of law. Now, counsel made a comment earlier in argument that severe pervasiveness suggests that we're to look at the actions of Rivers as for the issue of severe pervasiveness, that the way that Rivers responded contributes to a finding that these actions were severe pervasive. But just to be clear, that's not what courts look at in deciding the severe pervasiveness prong of a sexual harassment case. What they look at is the actions themselves, including factors in the totality of the circumstances like the frequency of the conduct, how offensive it is to a reasonable person, and whether it is physically threatening or humiliating. And as a matter of law, these factors strongly favor Rivers' position in this case. Indeed, the Seventh Circuit in 2018 held that a hand on the thigh, a kiss on the lips, or a pinch on the behind is not severe pervasive. And there are other cases cited in our briefs in which courts have held that there is no severe pervasiveness with facts more egregious than this. But let's just come back to something for a second. This was alluded to. It wasn't said exactly the way I'm about to say it, but I think Justice Taylor and Justice Jensen both alluded to what about the change in the standards of decency that our society is now experiencing? And there's nothing from our Supreme Court that gives us any direction on this issue. And how do you think we should consider that? What the federal courts have done in interpreting Title VII, prior... And I do want to hear what the federal courts say, but I just want you to know, those are older cases. And we realize that just even over the... I'll just say the last five years, the standard of decency has changed. So now go ahead. You can respond. You can start with the federal courts. Yeah. The way the federal courts... It used to be the courts would say that it was a hellish standard, that unless the employees experience the hellish work environment, then it's not actionable harassment under the law. And courts no longer use this hellish standard. But at the end of the day, whether you're looking at Title VII or the Illinois Human Rights Act, these are not civility codes, and not everything that happens at work rises to the level of harassment under the act. There are unpleasantries, unfortunately, that people deal with at work. And it's not to say that the conduct is appropriate. But when people go out into the world, there is a level of thick skin that individuals have to have. This is cited in harassment cases. And at the end of the day, it's not a matter of whether the conduct was appropriate. It's whether it was severe or pervasive. In looking at it from a plaintiff in a similar circumstance, a reasonable person in similar circumstances as the plaintiff. I don't know if that answered your question, Your Honor. But I think ultimately, the issue is courts need to be careful not to penalize isolated incidents or unfortunate and inappropriate, but not severe or pervasive conduct. And especially in the case of non-employees like customers, there's a reason why the Illinois Human Rights Act has a specific section that's dedicated to employer liability as it relates to managerial employees and non-employees. Because especially in the case of harassment by customers, employers cannot necessarily be held liable for everything that a customer does. Your Honors, at the end of the day, there are no material facts in dispute in this case. The parties agree that Ms. Wong first complained of harassment on July 6th, then never again after July 14th. The circuit court correctly held that River's actions in response to Ms. Wong's complaints were reasonable. And no reasonable jury can conclude otherwise, as the circuit court held. And although the court only decided summary judgment on that basis, there is the alternative basis for affirming summary judgment, which is that the conduct of which Ms. Wong complained, while no doubt inappropriate, was not severe or pervasive as a matter of law. And because Ms. Wong cannot present a triable issue to the jury on these issues, summary judgment should be affirmed. Thank you, Mr. Leach. Mr. Small? Thank you, Your Honor. I'll be brief. I don't believe that a court should be setting a firm and fast rule about what is severe and pervasive, frankly. With the changing mores of society, I believe many jurors could conclude that a woman being sexually harassed twice on each shift, on July 13th and on July 14th, constitutes severe and pervasive. By the same token, a jury might conclude otherwise. But it should be left to the jury to decide that issue. It should not be a matter of law. Second, with respect to the reasonable corrective measures, counsel is correct that there are cases in which a longer period of time passes. But generally in sexual harassment cases, we have a situation where an HR department needs to conduct an investigation. They need to interview multiple employees. They need to decide whether to sanction the particular employee accused of the harassment. There's a lot of complexities to that inquiry. Here, the solution was to walk a stanchion from one part of the casino to another. It fixed the problem. We do not dispute that. It fixed the problem. The question is, should it have been done right away? Again, a jury might conclude, you know what, there's a lot going on at a casino, eight days, that's not a ton of time, it's reasonable. But a jury could also easily say, why didn't you do this easy solution immediately? This isn't a function of a complex investigation. It's all on video. You know putting a barrier works. Why not just do it? And so I don't think that either... I think one of the arguments that Mr. Leach is making though, he believes that it, and he argues that the law says that it depends upon the gravity of the harassment in terms of how quickly the response needs to occur or how dramatic that response should be. Do you want to respond? Yes. And I think that if we're going to start weighing the gravity of the harassment, we should also start weighing the complexity and the gravity of the solution. Again, there are many sexual harassment cases where an in-depth, detailed investigation has to go on because you may be ultimately firing somebody and taking away their livelihood. None of these and there is a very simple, cost-effective, essentially free solution to the problem. And so if we're going to weigh the gravity of the harassment, we might as well also weigh the nature of the solution. I believe a jury should be doing the weighing of those two things, and it should not be decided as a matter of law. So Mr. Spillaw, I'm sorry, Justice Thompson, no, go ahead. You start it first. Go ahead, please. Okay. So whether or not the actions were reasonable aside, are there any facts in dispute? I don't believe that there are really any substantive facts in dispute about what transpired. Certainly the impact it had on Ms. Wong, I imagine defendants would argue it had less of an impact than she claims, but in terms of the conduct itself and what transpired, I don't believe we have many fundamental disagreements. Mr. Smola, so we were talking to Mr. Leach about changing mores and he pointed out that the standard used to be, once it used to be, conduct has to be hellish or the experience must be hellish and the courts rightly recognize, well, that's really not the right standard. And then Mr. Leach was pointing out that the Seventh Circuit has stated, for example, quote, a hand on the thigh, a kiss on the lips, a pinch of the buttocks, that may not be sufficiently abusive as to be severe for purposes of Title VII. And our question to him was, well, with changing mores, is that the proper standard? And so I like to, and he indicated, well, that's the standard that is, you know, why should we follow that case law of the Seventh Circuit? First of all, I think if we look at that case carefully, a lot of those things occurred in isolation. They weren't all occurring at the same time. They weren't occurring on the same days. And the solution proposed was much more complex. It was a workplace dispute, essentially. I don't believe that anyone should be subject to what Ms. Wong endured. Now, I recognize that we can't hold an employer responsible for every single event that occurs in a workspace. But if we weigh the necessity, I'm sorry, if we weigh the solution to the problem, how much, and courts do that all the time, courts weigh, you know, how feasible was the solution? So you would do a cost-benefit analysis, and your position is that the cost was minimal and the benefit was maximal. Correct. That's a word. Sure. That would be, I certainly think that should be a consideration. What are the, what was the response of the employee, I'm sorry, the employer, and what was the employee experiencing? So a couple of things, Mr. Smoller, and we all know that this case is different because this case doesn't involve harassment from a manager or an employee. This is a third-party situation, and that's why we're dealing with a different standard here. You were just asked a question by Justice Johnson about the facts in this case not being in dispute. And you probably are aware, I'm sure you are, being as astute as you both are, that recently, well, not recently, but the second district of this court recently held that where the facts are not in dispute, that this issue may be determined as a matter of law. And that's what the trial court did here. They took, the trial court found that the facts were not in dispute. Earlier, I believe, Mr. Leach was asked the same question, whether or not the facts were in dispute. He said that he, that they're pretty much not. I think your answer was even stronger than his answer by saying that there were no facts in dispute. And so why can't the issue be decided as a matter of law? Because there's no, there's no definition of what a reasonable corrective measure is, right? There's no, there's very little case law on that as well. And there's no, and I, and in terms of judging the reasonableness of conduct, we almost always leave that to a jury. So in light of those circumstances, it's not that the facts are heavily in dispute, but it's that what could a reasonable person expect Rivers to have done? If we decide as a matter of law that waiting eight days for corrective measures is acceptable, then I suppose that's now the law in. Well, would that, would that be a correct statement of the facts though, that they waited eight days for corrective measures? Is that a correct statement of what's going on in this case? I don't think it is. Well, there's certainly, there were no corrective measures on the 13th when she's hugged, not once, but twice. On the 14th, when she arrives, there's no measures, but not others. But again, now we're weighing the facts in a manner that should be left to a jury. We're sort of analyzing the individual actions that they took over a period of days. That's something that the fact finder tends to do and in determining whether the conduct was reasonable. Well, counsel, you have acknowledged that there isn't much case law in this area. So why shouldn't we be persuaded or look to the cases in the seventh district or the second circuit that have found that if there's no genuine issue of material fact, that the court can decide whether or not the actions were reasonable as a matter of law. I think that the, that in all these cases, there's sort of a, you know, a scale of the conducted issue. I don't believe that there's a case that's analogous to our case here. There's not another case in which a casino worker was harassed behind a beer tub when there was an easy solution. I think that these are very fact-driven cases. And in this instance, the inferences and the conclusions made from those facts could vary significantly person to person. You know, some jurors may think this isn't a big deal. Other jurors may think that it's utterly preposterous to have not put a stanchion in place right when it's requested. So yeah, I just believe that while the facts are not in dispute, the consequence of those facts and the analysis of those facts is something that should be left to a jury. And I want to point out one thing. There is no distinction between the standard held for non-supervisor employees and third-party harassment. And under the Human Rights Act, they are the same standard. So there's a different standard for supervisors and managers, but those standards are the same. So what this court rules in this particular case is going to apply in both third-party sexual harassment cases and cases involving non-supervisor employees. And with that, Your Honors, I thank you all for your time. Okay. Thank you, Mr. Smoller. Thank you, Mr. Leach. We appreciate it. You both did an excellent job with your argument today, and we appreciate excellence. So thank you.